50 A.3d 93

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–APPELLANT, v. C.H. AND M.B., DEFENDANTS–RESPONDENTS.

IN THE MATTER OF J.B., A MINOR.

Superior Court of New Jersey
Appellate Division

Argued March 14, 2012—Decided August 23, 2012.

Before Judges AXELRAD, SAPP–PETERSON and OSTRER.

*Diane L. Scott*, Deputy Attorney General, argued the cause for appellant (*Jeffrey S. Chiesa*, Attorney General, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Ms. Scott*, on the briefs).

*Allison C. Williams* argued the cause for respondents (*Pitman, Mindas, Grossman, Lee* and *Moore, P.C.*, attorneys; *Ms. Williams*, on the brief).

*Jeffrey R. Jablonski*, Designated Counsel, argued the cause for minor (*Joseph E. Krakora*, Public Defender, Law Guardian, attorney; *Mr. Jablonski*, on the brief).

The opinion of the court was delivered by

AXELRAD, P.J.A.D.

In this appeal, we address the trial court's sua sponte dismissal of an abuse or neglect complaint filed by the Division of Youth and Family Services (the Division) [1] in the interim between the close of its presentation of evidence and the scheduled return date for defense witness testimony, without notice to the parties or an opportunity to be heard. The case arose out of the ingestion of about thirty prescription pills by J.B., a toddler, while he was solely supervised by his mother C.H., resulting in a severe medication overdose, hospitalization, and, fortunately, full recovery.

The Division argues that the sua sponte dismissal deprived it of its due process rights, was based on an improper legal analysis, and was erroneous, as it had established a prima facie case. The

---

[1] On June 29, 2012, the Governor signed into law A–3101, which reorganizes the Department of Children and Families, which includes the renaming of the Division as the Division of Child Protection and Permanency. *L.* 2012, *c.* 16, eff. June 29, 2012.

Law Guardian supports the position taken by the Division regarding the violation of due process, and the Division's establishing a prima facie case of abuse or neglect. Both the Division and the Law Guardian seek reinstatement of the complaint and remand to the trial court.[2] We agree the court erred procedurally and substantively with respect to C.H., and reverse and remand for continuation of the fact-finding hearing. We affirm the court's dismissal of the complaint against the father M.B., as it was entered following an oral motion and argument by counsel.

## I.

J.B. was born on October 26, 2007 to C.H. and M.B. (collectively defendants), who are married. On October 1, 2008, the Division filed a verified complaint alleging defendants abused or neglected J.B., based on an incident a week prior when then-eleven-month-old J.B. ingested C.H.'s prescription medication while in her care and was hospitalized in critical condition.[3] The complaint sought care, custody and supervision of the child, pursuant to *N.J.S.A.* 9:6–8.21 and *N.J.S.A.* 30:4C–12.

A hearing on the order to show cause was conducted that day and continued telephonically on October 2, 2008. At the conclusion, the court entered an order, directing that J.B. be placed in the physical custody of his paternal grandmother B.G. in defendants' home upon his release from the hospital, although he remained under the legal custody, care and supervision of the Division. Defendants were given permission to remain in the home, provided J.B.'s grandmother and his nanny, Ms. C., moved in and supervised all contact with his parents.

---

[2] In its reply brief, the Division contends that both parties accept the court's factual findings and request we exercise original jurisdiction, *R.* 2:10–5, and reverse the trial court's finding that C.H. did not abuse or neglect J.B. within the intendment of *N.J.S.A.* 9:6–8.21, rather than remand the matter to the trial court to conclude the fact-finding. We decline to do so.

[3] The matter was also referred to the Essex County Prosecutor, who apparently was awaiting the results of this abuse or neglect proceeding.

A fact-finding hearing was held over three days—April 3, 2009, September 21, 2009, and June 7, 2010. At the conclusion of the Division's presentation of evidence on June 7, the court granted M.B.'s oral motion and dismissed him from litigation, but gave him permission to be present in the courtroom for the remainder of the proceedings.

The next scheduled hearing was set for July 26, 2010, for defendants to produce expert testimony and, if desired, the testimony of M.B. However, on June 17, 2010, the trial judge sua sponte by letter opinion dismissed the case against defendants, and an order terminating the litigation was entered on June 18, 2010. On July 19, 2010, the court entered an order directing the Division to remove C.H.'s name from its Central Registry, and expunge all agency records related to C.H., M.B., or J.B., within three years of the order. The Division appealed.

On appeal, the Division argues:

*POINT I*

THE DIVISION'S COMPLAINT SHOULD BE REINSTATED AND THE MATTER SHOULD BE REMANDED TO THE TRIAL COURT TO COMPLETE TRIAL.

A. [The trial judge's] sua sponte decision to dismiss this case should not be upheld because it denied the Division [its] due process rights of notice and opportunity to be heard.

B. [The trial judge's] sua sponte decision to dismiss should not be upheld because he misapplied the law.

1. Sua sponte decisions are reviewed de novo when a judge misapplies the law.

C. Sua sponte dismissal of the Division's complaint was erroneous since the evidence presented by the Division constituted a prima facie case.

The Law Guardian similarly challenges the trial court's sua sponte dismissal as violative of due process and the court's ruling of the Division's failure to establish a prima facie case as substantive error. The Division and the Law Guardian seek reinstatement of the complaint and remand to the trial court for completion of trial. We are convinced by these arguments and reverse and remand as to C.H.

## II.

### A.

J.B. and his family became known to the Division on September 20, 2008, when the agency received a referral from Shira Gertz, M.D., of Newark Beth Israel Hospital, who reported that eleven-month-old J.B. had come into the pediatric intensive care unit "critically ill" after ingesting twenty-one Wellbutrin pills, an anti-depressant medication. The referral response report prepared by the Division caseworker Trent Collier details the incident that resulted in this referral, as reported to him by C.H. and M.B. in separate interviews.

C.H. reported that on September 19, 2008, at some time between 7:30 p.m. and 8:00 p.m., she and J.B. were in her bedroom. C.H. was the only person watching J.B. as the nanny had left at approximately 4:00 p.m. She further reported that she placed J.B. in his play yard, a light-weight, fence-like device with no bottom, which he could move when he pushed it forcefully. The play yard was located one to two feet away from C.H.'s night stand, where she kept her prescription Wellbutrin pill bottle. C.H. told Collier that she did not see a need to keep her medication in a locked box.

C.H. reported that J.B. was playing with his toys in the play yard while she was "fiddling with her new cellular phone." She heard a humming sound coming from J.B., and when she looked in his direction she observed he had her pill bottle in his mouth. According to C.H., she was concentrating on her phone, and not J.B., for "two to three minutes." She immediately took the bottle from J.B., swept his mouth with her finger to feel for pills, and picked up a total of forty-four pills that she found on the floor.

C.H. counted the pills, and determined she was missing approximately thirty pills after taking into account the pills remaining and the pills she had taken in the two weeks since starting the bottle. She did not think J.B. could have swallowed the pills; rather, she thought she had been shorted one month's supply of her medication.

M.B. reported that when he returned home from work at approximately 8:00 p.m., C.H. told him what happened. When he entered the bedroom, he noticed the play yard was moved closer to the night stand than usual. He reported that the play yard and the night stand are of the same height. They contacted J.B.'s pediatrician and poison control, and were instructed to take J.B. to the emergency room.

Upon arriving at Mountainside Hospital, J.B. began having a seizure. J.B. was transferred to St. Barnabas, and eventually transferred to Beth Israel, where he was treated by Dr. Gertz, who contacted the Division.

Collier further reported that, when questioned, C.H. denied giving J.B. the pills. However, she did admit being overwhelmed with having a new home, change of environment, new responsibilities and a new identity as a mother. While discussing her mental health, C.H. reported that she was diagnosed with postpartum depression in April of that year, and her treating physician was Dr. Alison Weiner.

On September 21, 2008, due to the suspicious circumstances surrounding J.B.'s condition, Collier reported the incident to the Montclair Police Department and the Essex County Prosecutor's Office. The Prosecutor's Office obtained a search warrant for defendants' residence and observed numerous prescription vials in the master bedroom, including narcotic pain medications.

At the show cause hearing on October 1, 2008, the following people testified: Martha Camille, an investigative case manager for the Division in the Child Advocacy Center, Ms. C., and M.B. Camille described the facts surrounding the incident on September 19, and how the agency came to be involved in J.B.'s case as reflected on its referral response report.

Camille testified that x-rays taken of J.B. upon his arrival at Mountainside showed there were twenty-one whole pills visible in his stomach, and other pills showed to have passed through to his intestines. She explained, based on her discussions with consult-

ing doctors, that due to J.B.'s age and development, they did not believe it was plausible that he would be able to open a childproof bottle, pick up the individual pills, or ingest that amount of pills on his own. She advised that the Wellbutrin that J.B. ingested had been prescribed for C.H. as an antidepressant because it had been reported that C.H. "suffers from post[ ]partum depression." Camille opined that it would not be safe to return J.B. to defendants' care.

Ms. C. testified that she had been working as a nanny for J.B. for about eight months and defendants were "very good" with their son. She described J.B.'s abilities at his age of eleven months, explaining that J.B. had been "capable of picking up and ingesting Cheerios" for about two months, and he was "slightly advanced dextrally." She could not give an accurate representation of how many Cheerios J.B. could eat in a minute, explaining that sometimes, "if he [is] eating and one drop[ped], . . . he will focus on that one to pick up to eat before he touch[ed] any more."

The nanny described J.B.'s ability to change the shape of his play yard when he was in it. She explained that J.B. could shift the shape of it by moving the sides as he crawled along the edges. She did not believe, however, that if the play yard was at one place in the room and J.B. was inside, he could move it within a minute or two later to another location in the room. On cross-examination by the Law Guardian, Ms. C. was asked, "[i]f you and [J.B.] went into a room . . . and there was a . . . medicine bottle on a low table within his reach[,] what would you do?" Ms. C. answered, "I wouldn't put him in there . . . I would keep him away or—somewhere else."

M.B. described what happened during the night of the incident consistent with the referral response report. He explained that C.H. "immediately" told him what happened by describing the incident. He stated that after looking at the volume of thirty pills, he did not think J.B. could have eaten them all.

M.B. testified that it took about one hour for J.B.'s pediatrician to call back after C.H. first called him. In the meantime, C.H.

and M.B. looked at the overdose information for Wellbutrin, and searched the internet for information regarding an infant overdose. After finding an accelerated heartbeat to be a symptom, M.B. took J.B.'s heart rate several times with his stethoscope,[4] and found it to be higher than the eighty beats-per-minute noted on the website as normal. M.B. continued to check J.B.'s heart rate every five minutes until it slowed to eighty, and noted, during this time, that J.B. was acting normally. Until they got to Mountainside, it was not "obvious" that J.B. had ingested the pills.

During M.B.'s testimony, he presented a video of J.B. that he had taken earlier on the day of his testimony. The video depicted J.B. in his play yard eating Cheerios despite having a cast on his right arm. After viewing the video, the court commented that "[i]t clearly show[ed] he has a fair amount of manual dexterity." M.B. also testified J.B. was just learning how to pull himself on the play yard, and when he does this, "the play yard shifts slightly." M.B. explained that the night stand was the same height as the play yard, and so it was possible to knock things off.

M.B. also testified that he kept his medication on his four and one-half foot high bureau. He testified that it was very "important" to keep pills up high away from J.B.'s reach so the child could not access them.

After M.B. testified, the court asked the Division if its case rested on the incident being non-accidental. The Division made it clear its case did not rest solely on that allegation. The attorney for the Division explained, "we have no plausible explanation as to how this 11–month–old child ingested 21 to 30 pills[,]" and stated, at the very least, it was "carelessness." The Division then raised the issue of C.H.'s possible postpartum depression, implying that J.B. might be at risk if he were sent home with her.

C.H. did not testify at the hearing, although she was sworn in. She did, however, respond to the judge's question of what time

---

[4] M.B. owns a medical technology manufacturing plant which is presumably why he had a stethoscope in his home.

J.B.'s grandmother left the house on September 19 and what time J.B. swallowed the pills, stating, "[a] few minutes after 7 [p.m.]" and "[a]pproximately 7:45 [p.m.]." The judge then asked B.G. to be brought into the courtroom, swore her in, and asked her what time she left defendants' house that day, explaining he wanted to make sure she was not there at the time J.B. was injured. B.G. responded that she left "around 7[:00 p.m.] maybe a little before."

At the conclusion of the hearing on October 1, the court found the Division properly effectuated J.B.'s emergency removal from the custody of his parents to avoid an ongoing risk to his life, safety and health. Care, custody and supervision of J.B. was granted to the Division. The court and parties agreed that the court would hear medical testimony the following day.

The judge held a telephonic hearing with C.H.'s treating psychiatrist, Alison L. Weiner, M.D., and her treating licensed social worker, Susan Levine, on October 2, 2008. Both were sworn in and testified that C.H. had never been diagnosed with postpartum depression. Both opined that C.H. posed no risk of harm to J.B., and with the supervision of the paternal grandmother and the nanny, it would be safe for her to reside in the same house as J.B. Over the Division's objection, the court ordered that J.B. be placed in the physical care of his paternal grandmother once he was released from the hospital. The order additionally gave defendants permission to reside in the home with J.B., provided B.G. or Ms. C. resided there and supervised defendants' contact with their son. The court also ordered C.H. to undergo a psychiatric evaluation.

## B.

In preparation for the fact-finding hearing, C.H. was evaluated by the Division's consulting psychiatrist, Vivian C. Shnaidam, M.D., on October 28, 2008. C.H. reported her version of the story to Dr. Shnaidam, noted it was a "horrible experience," and said "[i]t didn't seem feasible to [her] that he had ingested 30 or more pills without [her] knowing it." C.H. explained that she told one

of J.B.'s nurses she was prescribed the Wellbutrin for symptoms of depression, "which [she] thought was postpartum."

Dr. Shnaidam concluded that C.H. did not suffer from postpartum depression, but had moderate Major Depression that was recurrent and in remission. She found nothing in C.H.'s presentation that suggested she was "psychotic," or "a psychopath" who would try to kill her child. Further, she applauded C.H.'s "use of psychotherapy and psychopharmacologic intervention to help her with her mood." Dr. Shnaidam opined there was "absolutely no reason" defendants should not move back into their bedroom and become J.B.'s primary caretakers.

On April 3, 2009, the fact-finding hearing commenced with counsel and the court addressing a variety of preliminary evidence issues. No testimony was heard. Dr. Gertz and Robert L. Morgan, M.D., testified as experts for the Division on September 21, 2009 and June 7, 2010, and the court stated it would take into account Camille's testimony during the previous hearing as a witness for the Division.[5] The Division entered into evidence its records, and J.B.'s medical records and x-rays. Defendants entered exhibits from the American Association of Poison Control and the New Jersey Poison Information and Education System.

Dr. Gertz was accepted as an expert in pediatric critical care. Dr. Gertz attended to J.B. at Newark Beth Israel, after she was notified by her colleague at St. Barnabas that J.B. was in full cardiovascular collapse, was on a ventilator, and needed a heart/lung bypass. J.B.'s condition required four people to help safely transfer him to Beth Israel. In the interim, Dr. Gertz researched this type of child overdose but found little information, even in the poison control database; she characterized this type of incident as "unprecedented."

Dr. Gertz considered J.B.'s prognosis as "[d]ismal." To counter the effects of Wellbutrin, J.B. had received ten times the normal

---

[5] The current caseworker, Ebony Williams, also testified briefly on September 21, 2009, as the custodian of the records.

amount of blood pressure medicine, which, in her experience, no adult or child could have survived. When J.B. arrived, they placed him on an Extracorporeal Membrane Oxygenation (ECMO) Machine, a heart/lung bypass to give his heart and lungs a chance to rest and the Wellbutrin a chance to pass out of his system. J.B.'s condition began to improve immediately. After four days he was taken off the machine, and after six days, his breathing tube was removed. She said it was "a miracle" that J.B. was discharged from the hospital in excellent condition.

Dr. Gertz further testified that on the x-ray they could observe the Wellbutrin tablets intact. She explained that they are extended release tablets with a "hard shell with small little holes in them and ... [a] little sponge-like material inside, so as the sponge gets wet it squishes out the medicine through the little holes." The hard outer shell then passes in the stool.

In accordance with her normal practice, Dr. Gertz spoke to both C.H. and M.B. separately after J.B. had been on the machine for a few hours in order to obtain a history of what occurred. According to Dr. Gertz, C.H.'s reaction to J.B.'s condition was different from other parents' reactions—she was "very flat," meaning she did "not exhibit[ ] the usual emotion that [she] see[s] in a parent of a critically ill, potentially dying child." However, she conceded on cross-examination that both parents cried when she told them J.B. might die and had to be placed on the ECMO machine.

Dr. Gertz called the Division after J.B. was stabilized as routine protocol based on suspicions of potential abuse or neglect. Based on her experience, Dr. Gertz felt this incident "was inconsistent with a non-accidental ingestion" because children of J.B.'s age generally do not ingest more than one pill, nor had she ever seen a child in this age group swallow more than one pill. She noted that children of this age would likely pick up the pill, transfer it from hand to hand, and put it in their mouth, but would usually spit it out. Moreover, she presumed that consuming twenty-one pills would take "a great deal of time."

Dr. Gertz opined, based on her experience, "a child of this age cannot open a childproof cap[,]" which is the reason for having childproof caps. However, a child might be able to open the bottle if the cap were not properly secured, depending on how tightly the cap was on, and how much twisting was necessary. Dr. Gertz noted that, because the pills were visibly whole in J.B.'s stomach, and because they were hard cased, they would have to be swallowed whole, not chewed.

Dr. Gertz expressed the opinion that an eleven-month-old child would probably need assistance to swallow a pill. On cross-examination she was presented with studies regarding the commonality of accidental overdoses by children in the United States, as well as a study by the Food and Drug Administration which noted the record consumption of iron pills, that are bigger than Wellbutrin, by children between the ages of nine months to three years was ninety-eight pills.

During Dr. Gertz's testimony, the judge noted he reviewed defense videos in chambers of J.B. eating M & M's and Cheerios, moving his play yard, and knocking things down. These videos were not entered into evidence and are not contained in the appellate record.

After Dr. Gertz's testimony, the judge explained that a critical issue was how J.B. swallowed twenty-one to thirty pills, and gave counsel additional time to locate experts to testify to clarify that question.

The Division presented the report of Dr. Morgan and defendants presented the report of Daniel Adler, M.D. On June 7, 2010, the Division presented Dr. Morgan, who was accepted as an expert in pediatrics. The judge limited Dr. Morgan's testimony to whether or not an eleven-month old would have willingly swallowed twenty-one Wellbutrin pills and, if so, would there be chewing involved. The judge commented that he did not need additional testimony on the opening of the bottle since the record was unclear as to whether the bottle was securely fastened; nor did he require additional testimony on whether C.H. acted so

negligently that the Division could sustain a claim of abuse or neglect under *Foldi v. Jeffries*, 93 *N.J.* 533, 461 *A.*2d 1145 (1983).

Dr. Morgan testified that he found the chain of events—beginning with the infant getting over to the night table without being heard by someone evidently in the room, opening the childproof vial, and swallowing at least twenty-one pills without incident or notice—to be "extraordinary" that he "could not explain happening." He stated, with medical certainty, that an infant of this age should not be able to open a childproof bottle. He later clarified that it was "extraordinary" in and of itself for an infant of this age to swallow so many pills.

Dr. Morgan explained that at about nine or ten months of age, children are introduced to finger foods such as Cheerios. "[I]nfants that age will put basically anything in their mouth" and possibly swallow it whole so the "choking hazard is extraordinary." He testified it was possible that an eleven-month-old child would voluntarily swallow twenty-one pills whole, explaining that children "are a bit robotic at that age, and if there is no ill-effect, no adverse effects . . . they may keep doing the same repetitive thing." He found the probability that "21 times of doing the same procedure and not having an adverse outcome, at least from gagging, from choking" to be "staggering."

J.B.'s medical records contained no evidence that he had bruising on his neck, problems with his esophagus, or any other signs consistent with the possibility that he was forced to swallow the pills. Dr. Morgan repeated that, though the events were "highly unexplainable, from a medical standpoint," he could not state, with any degree of medical accuracy, whether or not the injury was accidental. He opined that a Wellbutrin tablet would have likely triggered a chewing or masticating response by J.B. The judge commented that such testimony raised the question of whether J.B. voluntarily took the pills because the pills were intact in his stomach, not chewed.

On cross-examination, Dr. Morgan stated it was possible that J.B. could have put more than one pill in his mouth at a time

because a child of his age could "rake" the pills towards him from the floor and move his hand containing more than one pill into his mouth. However, if J.B. put all the pills in his mouth at once, he would most likely choke rather than if he only put two pills in his mouth at once.

The defense then orally moved to dismiss M.B. from the litigation as he was not home when J.B. ingested the pills. The court granted this motion, over the Division's objection, finding "he cannot be found to have abused and neglected [J.B.]," but permitted M.B. to remain in the courtroom. An order dismissing M.B. from the case was entered on June 17, 2010.

Defendants represented they intended to call Dr. Adler on the next scheduled hearing date set for July 26, 2010, to testify regarding how J.B. could have swallowed the pills. The judge stated, "It's necessary for Dr. Adler, when he testifies on July 26[ ], to indicate what he meant by 'chewing.' And whether the word 'chewing' was inconsistent with the intact nature of the pills." The judge also stated that Dr. Adler should be prepared to testify as Dr. Morgan did regarding children's different ranges of swallowing and gagging reflexes. Defense counsel confirmed that Dr. Adler would address those issues.

 Defense counsel also represented she might call M.B. to testify, but at the time was not planning on calling C.H. to testify.[6] The Division noted the possibility of calling a rebuttal witness in response to Dr. Adler's testimony.

---

[6] C.H. is not compelled to testify to avoid an adverse determination at the fact-finding hearing; however, once the Division has established a prima facie case of abuse or neglect, the burden of proof shifts to her to exculpate herself. *See N.J. Div. of Youth & Family Servs. v. S.S.*, 275 *N.J.Super.* 173, 178–81, 645 *A.2d* 1213 (App.Div.1994). *See also State v. P.Z.*, 152 *N.J.* 86, 101, 703 *A.2d* 901 (1997). C.H.'s "oral testimony [is] merely one means of several available to her to demonstrate nonculpability." *S.S., supra,* 275 *N.J.Super.* at 181, 645 *A.2d* 1213.

## C.

Notwithstanding the expectation of all parties to resume trial on July 26, the court issued a letter opinion on June 17 sua sponte directing a verdict in favor of both defendants and on June 18, and entered an order terminating litigation. The court concluded that the Division had not proven by a preponderance of the evidence that M.B. or C.H. had abused or neglected J.B. The court made twenty findings of fact, including that: on the subject date, C.H., the sole supervisor, placed eleven-month-old J.B. in his play yard in her bedroom between 7:30 p.m. and 8:00 p.m.; the play yard "is built out of a fairly light material" and is conceivably movable by a young child a short distance; while J.B. was playing in the play yard, C.H. was two or three feet away reading instructions on how to operate her new cellular phone and was not looking at J.B.; around that time C.H. placed or left a prescription bottle containing her antidepressant medication Wellbutrin on the nightstand one or two feet from the play yard; when C.H. was not looking at J.B., he apparently moved his play yard one or two feet, bumped it into the nightstand with sufficient force to knock over the Wellbutrin bottle, or knocked the bottle over with his hand, and consumed twenty-one to thirty pills (possibly the safety cap was not securely fastened); after 7:30 p.m. and before 8:00 p.m., C.H. heard a "humming" sound from J.B., looked over and saw the medicine bottle in his mouth, grabbed it and began swabbing his mouth for pills, but found none; and C.H. picked up forty-four pills from the floor, calculated there were thirty pills missing, and the hospital to which J.B. was taken shortly thereafter reported that he swallowed twenty-one to thirty pills.

The judge noted C.H.'s statement that her time period of inattention was two to three minutes. The judge then concluded that despite C.H.'s "uncontradicted testimony" to that effect and his observation in videos that J.B. was "relatively strong and agile," the judge was "not capable of stating with any degree of certainty that the exact length of time that [C.H.] did not observe

[J.B.] was 2–3 minutes, as opposed to another time period, such as, for example, 5–10 minutes."

The court further found that "[d]espite conjecture by hospital personnel, including Dr. Shira Gertz ... that [C.H.] might have acted non-accidentally, there is no hard proof that the injuries were non[-]accidental[.]" The court concluded that the Division could not prove C.H. tried to kill J.B.

The court found the circumstances of the case equivalent to those presented in *Foldi*, where the Supreme Court held the defense of parental immunity applicable to a parent's simple negligence in supervision but not to a parent's "willful or wanton misconduct in supervising his or her child." *Supra*, 93 *N.J.* at 547, 461 *A.*2d 1145. There, the mother and her two-and-one-half-year-old daughter were gardening in their front yard. *Id.* at 535, 461 *A.*2d 1145. The child wandered out of the yard and onto a neighbor's property two doors away where she was bitten on the face by the neighbor's dog. *Ibid.* The mother testified that only five to ten minutes elapsed from when she had last seen her daughter to when she found her in the neighbor's driveway. *Ibid.* The Court found the undisputed facts demonstrated that the mother was, "at worst, merely negligent," noting, in part, that there was no evidence that she "would have perceived a high probability of injury to [the child]" in their own front yard. *Id.* at 550–51, 461 *A.*2d 1145. The Court commented that its "result might [have been] different if they had been standing at a railroad track." *Id.* at 551, 461 *A.*2d 1145.

Here, the court similarly found that C.H. was "at worst, merely negligent." The court thus determined that the Division had failed to meet its burden as a matter of law of demonstrating that C.H. failed to exercise a minimum degree of care under the statute. Accordingly, the court sua sponte entered the challenged orders.

### III.

The Division and the Law Guardian both argue the trial judge's sua sponte dismissal of the case denied the Division and J.B. their

due process of law rights of notice and an opportunity to be heard. They emphasize that defendants made no motion to dismiss as to C.H. and all parties had the expectation of returning to court on July 26, 2010, at the court's direction, for the testimony of the defense expert, Dr. Adler, and continuation of the fact-finding hearing on the Division's abuse or neglect complaint. The Division and the Law Guardian contend they were denied the opportunity to cross-examine the defense's medical expert, present potential rebuttal testimony, and advance legal arguments.

We agree with the Division and the Law Guardian that the court's sua sponte dismissal of the abuse or neglect complaint against C.H. was a due process violation necessitating a remand. We are satisfied, however, that the court's dismissal of the case against M.B. was procedurally and substantively sustainable. The court granted M.B.'s oral motion on the record on June 7, 2010 after hearing argument by the parties. It is undisputed that M.B. was not present during the incident and the Division has presented no evidence to support a statutory finding of neglect against him.

The judge has a duty to conduct a fact-finding hearing to determine whether the Division has proved abuse or neglect by a preponderance of the evidence. *N.J. Div. of Youth & Family Servs. v. G.M.*, 198 *N.J.* 382, 398, 968 *A.*2d 698 (2009); *N.J.S.A.* 9:6–8.44, –8.46(b). At the conclusion of the fact-finding hearing, under *N.J.S.A.* 9:6–8.50(c), the court has the option of dismissing the complaint and stating the grounds for dismissal if sufficient facts to sustain the complaint under the statute are not established. *G.M., supra,* 198 *N.J.* at 398, 968 *A.*2d 698.

Nevertheless, at the conclusion of the Division's proofs, C.H. would have been entitled to "move for a dismissal of the action or of any claim on the ground that upon the facts and upon the law [the Division] has shown no right to relief." *R.* 4:37–2(b). By using the mandatory "shall," the *Rule* requires denial of the motion "if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in [the Division's] favor."

*Ibid.* Generally, it is a party's responsibility to seek this relief. Defense counsel moved for a dismissal of the complaint as against M.B. at the close of the Division's case in chief. Presumably, had counsel concluded that a prima facie case had not been met as to C.H., she would have moved for a dismissal under the *Rule* at the same time. She did not.

■ A sua sponte dismissal of the complaint against C.H. as happened here violated the due process rights of the parties. In *Klier v. Sordoni Skanska Const. Co.*, 337 *N.J.Super.* 76, 81–83, 766 A.2d 761 (App.Div.2001), we held that a trial judge erred in sua sponte instituting a summary procedure in which the plaintiffs' attorney proffered his best case and the court then dismissed the complaint rather than conducting a trial or requiring the defense to present motions in accordance with the Court Rules. We refused to "condone a procedure whereby a judge *sua sponte,* without notice to a party, resorts to a 'shortcut' ... and circumvents the basic requirements of notice and opportunity to be heard." *Id.* at 84–85, 766 A.2d 761. We explained:

The cornerstone of our judicial system is that justice is the polestar and the procedures utilized by the courts must "be moulded and applied with that in mind." *N.J. Highway Authority v. Renner,* 18 *N.J.* 485, 495 [114 A.2d 555] (1955). Our ultimate goal is not, and should not be, swift disposition of cases at the expense of fairness and justice. Rather, our ultimate goal is the fair resolution of controversies and disputes. *R.H. Lytle Co. v. Swing–Rite Door Co., Inc.,* 287 *N.J.Super.* 510, 513 [671 A.2d 602] (App.Div.1996). Eagerness to move cases must defer to our paramount duty to administer justice in the individual case. *Audubon Volunteer Fire Co. No. 1 v. Church Constr. Co.,* 206 *N.J.Super.* 405, 406 [502 A.2d 1183] (App.Div.1986). Stated another way, while the concepts of "judicial administration" and fairness are not necessarily incompatible, the desire to facilitate judicial administration must take a back seat to our primary goal which is to adjudicate cases fairly and impartially. Shortcuts should not be utilized at the expense of justice.

[*Klier, supra,* 337 *N.J.Super.* at 83, 766 A.2d 761.]

Noting that the fact-finding hearing is a "critical stage[ ] in Title Nine proceedings," the Supreme Court has also reiterated that "[t]hose hearings must be conducted with scrupulous adherence to procedural safeguards." *G.M., supra,* 198 *N.J.* at 401, 968 A.2d 698 (internal quotation marks and citation omitted).

In *Klier,* we emphasized that "[t]he minimum requirements of due process of law are notice and an opportunity to be heard[,]" which contemplates being heard in a meaningful manner. *Supra,* 337 *N.J.Super.* at 84, 766 *A.*2d 761 (citing *Doe v. Poritz,* 142 *N.J.* 1, 106, 662 *A.*2d 367 (1995)). *See also Curzi v. Raub,* 415 *N.J.Super.* 1, 28, 999 *A.*2d 1182 (App.Div.2010) (holding that prior to exercising his mandatory obligation to review a punitive damage award to ascertain whether it was reasonable in amount or justified under the circumstances, due process required the trial judge to give the parties notice of the issue and an opportunity to be heard). Had defendants moved to dismiss the complaint, the Division would have been given the opportunity to respond. The court erred by essentially taking a "shortcut" and sua sponte, without notice to the parties, disposing of the case prior to the scheduled resumption of trial. This action deprived the Division and the Law Guardian of the opportunity to prove their case through cross-examination of defendants' expert, potential rebuttal testimony, and closing arguments.

The Division and the Law Guardian next argue that the court misapplied the applicable law. The Division contends the court placed too much weight on *Foldi,* a non-Title 9 case, and both contend that dismissal of the complaint against C.H. was erroneous because the evidence presented by the Division constituted a prima facie case of abuse or neglect under the statute. We agree. *See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.").

Abuse or neglect cases fall under Title 9, which places the safety of children as the paramount concern. *N.J.S.A.* 9:6–8.8, and –8.21 to –8.73; *N.J. Div. of Youth & Family Servs. v. P.W.R.,* 205 *N.J.* 17, 31, 11 *A.*3d 844 (2011). *N.J.S.A.* 9:6–8.21 defines an "[a]bused or neglected child," in pertinent part, as

a child less than 18 years of age whose parent or guardian ... (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death ... or protracted impairment of

physical or emotional health or protracted loss or impairment of the function of any bodily organ; (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death ... or protracted loss or impairment of the function of any bodily organ; ... (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian ... to exercise a minimum degree of care ... (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof ... or by any other acts of a similarly serious nature requiring the aid of the court[.]

[*N.J.S.A.* 9:6–8.21(c)(1)–(4).]

■ At a fact-finding hearing, the Division has the burden to prove by a preponderance of the competent, material and relevant evidence that J.B. is an abused or neglected child. *See N.J.S.A.* 9:6–8.46(b)(1) & (2). The Division is required to demonstrate that C.H. inflicted or allowed to be inflicted on J.B. a physical injury "by other than accidental means" due to her failure "to exercise a minimum degree of care." *See N.J.S.A.* 9:6–8.21(c). *See also P.W.R., supra,* 205 *N.J.* at 32, 11 *A.*3d 844.

The Supreme Court determined that the phrase "by other than accidental means" refers to the circumstances preceding the accident, and held that "[w]here an action is deliberate, and the actor can or should foresee that his conduct is likely to result in injury, as a matter of law, that injury is caused by other than accidental means." *G.S. v. Dep't of Human Servs.,* 157 *N.J.* 161, 175, 723 *A.*2d 612 (1999) (internal quotation marks and citations omitted). The Court elaborated:

[I]f an intentional act produces an unintended result[,] the injury is not accidental. A parent or guardian can commit child abuse even though the resulting injury is not intended. DYFS and the courts must examine the circumstances leading up to the injury to determine whether it was caused by accidental means. *The intent of the parent or guardian is irrelevant.*

The legislative history of Title 9, precedent, and public policy support the conclusion that a *Title 9 inquiry must focus on the circumstances leading up to the injury and on the harm to the child, and not on the guardian's intent.* ...

. . . .

Accordingly, under Title 9, whether the guardian intended to harm the child is irrelevant. If a parent or guardian commits an intentional act that has unintended consequences, that action is considered other than accidental within the meaning of Title 9.

[*Id.* at 175–76, 723 *A.*2d 612 (first and second alterations in original) (emphasis added) (internal quotation marks and citations omitted).]

In *G.S.*, the Court held "that a [parent or] guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." *Id.* at 181, 723 *A.*2d 612. Such conduct included the failure to perform a "cautionary act" that "would prevent a child from having his or her physical, mental or emotional condition impaired." *Id.* at 182, 723 *A.*2d 612.

In defining "failure to exercise a minimum degree of care" under *N.J.S.A.* 9:6–8.21, the Court rejected both a simple negligence standard and a standard requiring intent to harm. *Id.* at 177, 723 *A.*2d 612. Rather, the Court opined that this phrase "was chosen to capture a middle standard" and "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." *Id.* at 177–78, 723 *A.*2d 612. The Court explained that "[c]onduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." *Ibid.* Accordingly, "under a wanton and willful negligence standard, a person is liable for the foreseeable consequences of [his or] her actions, regardless of whether [he or] she actually intended to cause injury." *Id.* at 179, 723 *A.*2d 612.

*G.S.* involved a prescription medication overdose administered by a caregiver to a child at a facility for retarded persons. *Supra,* 157 *N.J.* at 166–67, 723 *A.*2d 612. The caregiver incorrectly administered the entire bottle of crushed pills without obtaining clarification on the correct dosage, resulting in the child's ingestion of seventy-eight times the prescribed dosage and hospitalization. *Id.* at 168, 723 *A.*2d 612. The Court concluded the caregiver's conduct clearly rose to the level of wanton or willful as she deliberately gave the child the entire bottle of pills without seeking clarification of the dosage even though she was unsure how much she was supposed to administer and despite understanding the grave dangers associated with prescription medications. *Id.* at 182–83, 723 *A.*2d 612. The Court reasoned that

although the caregiver did not intend harm to befall the child, "she utterly disregarded the substantial probability that harm would result from her actions[ ]" and commented that had he been on a "different medication, the outcome could have been more tragic." *Id.* at 183, 723 *A.*2d 612.

Subsequent cases have emphasized that a "parent's conduct must be evaluated in context based on the risks posed by the situation." *Dep't of Children & Families v. T.B.*, 207 *N.J.* 294, 309–10, 24 *A.*3d 290 (2011) (holding a mother who left her four-year-old son unsupervised for two hours, under the mistaken belief that his grandmother was home, was plainly negligent but her conduct did not rise to the level of gross negligence or recklessness so as to constitute a failure to exercise a minimum degree of care). *See also N.J. Div. of Youth & Family Servs. v. A.R.*, 419 *N.J.Super.* 538, 545–46, 17 *A.*3d 850 (App.Div.2011) (holding a finding of abuse or neglect was proper because a father was aware of the inherent dangers of leaving his ten-month-old child on a twin bed without rails next to a radiator, based on the father's placing blankets around the child as a buffer); *N.J. Dep't of Youth & Family Servs. v. J.L.*, 410 *N.J.Super.* 159, 161–62, 168–69, 980 *A.*2d 488 (App.Div.2009) (finding a mother's decision to let her children walk to their home from a play area in their complex, as she watched with an unobstructed view, only to result in them being locked inside of their home, did not rise to the level of willful or wanton misconduct to constitute a failure to exercise a mini-mum degree of care). Ultimately, the determination of whether a parent has neglected a child is fact-specific. *G.S., supra,* 157 *N.J.* at 181–82, 723 *A.*2d 612.

In its sua sponte ruling, the court acknowledged *G.S.*, recogniz-ing it was a Title 9 case involving a caregiver's accidental overdose of a young child, but concluded the "polestar of [his] analysis" should be the Court's opinion in *Foldi.* Though conceding it was not decided under Title 9, the court believed *Foldi,* unlike *G.S.,* "directly addresse[d] the negligent supervision of a young child." According to the court, *Foldi* further addressed "the issue of

whether a parent who fail[ed] to observe his or her child has committed gross and wanton negligence, the standard the G.S. Court set for [*N.J.S.A.*] 9:6–8.21(c) decisions." In *Foldi,* a parent-child tort immunity case, the court adopted "the willful or wanton standard as the liability threshold in parental supervision cases," opining that its "holding represents a reasonable compromise between two legitimate aims—a parent's right to raise, free of judicial interference, his or her child as he or she deems best, and a child's right to receive redress for wrongs done to him or her." *Supra,* 93 *N.J.* at 550, 547, 461 *A.*2d 1145.

Using a *Foldi* analysis, the court then focused on "three inter[-]related acts of negligence" that C.H. committed:

leaving the Wellbutrin bottle too near the play area, possibly not fastening the safety cap on the bottle and taking her eyes off of [J.B.] for some period of time. In [C.H.'s] favor, of course, is that [J.B.] was in a play area in the same room, which is generally a safe environment. Working against [C.H.] is that she knew [J.B.] was a strong, agile child who perhaps required more oversight than would a less physically accomplished child.

The court then proceeded with a nine-page discussion of the evidence respecting intentional conduct, concluding that the Division could not prove C.H. tried to kill her son.

The judge stated he was left with the question of whether C.H.'s negligent conduct met the standards set by the Foldi Court. He quoted from *Foldi,* as follows:

Here, the undisputed facts show that Mrs. Foldi was, at worst, merely negligent. The amount of her inattention to her daughter was slight. There is no evidence to show she was recklessly or consciously indifferent to Jennifer's welfare. Jennifer was out of her mother's sight only for a total period of 10 minutes. She and her mother were together in their own yard. There is no evidence that Mrs. Foldi would have perceived a high probability of injury to Jennifer there. This case represents a typical instance of a negligent lack of supervision, where a parent briefly loses sight of his or her child.

[*Supra,* 93 *N.J.* at 550–51, 461 *A.*2d 1145.]

The judge then essentially echoed the *Foldi* conclusion, stating:

Here, the undisputed facts show that [C.H.] was, at worst, merely negligent. The amount of her inattention to her son was slight. There is no evidence to show that she recklessly or consciously in differed to [J.B.'s] welfare. [J.B.] was out of his mother's sight while in a play area for a total of 2–3 minutes. He and his mother were together in the same room. There is no evidence that [C.H.] would have

perceived a high probability of injury to [J.B.] there. This case represents a typical instance of negligent lack of supervision where a parent briefly loses sight of his or her child.

The judge further noted that even if he assumed C.H.'s two to three minute estimate was slightly longer, and he factored in J.B.'s "apparently greater than average physical agility and [C.H.'s] negligence in leaving a pill bottle which may not have been sufficiently fastened in the same room, the negligence is no greater than that discussed in *Foldi*."

■ Here, the trial judge did apply the correct "willful and wanton" standard as utilized both in *Foldi* and *G.S.* The judge's assessment of the facts, however, was distorted by his sole reliance on the *Foldi* fact pattern rather than on the Title 9 policy considerations of *G.S.* and its progeny. Justice Garibaldi, who authored both opinions, did cite *Foldi* as an example of the Court's decision to utilize a willful and wanton negligence standard in response to similar concerns about balancing parents' constitutional rights to raise their children against the State's *parens patriae* power to protect children. *G.S., supra,* 157 *N.J.* at 179–80, 723 *A.*2d 612. Nevertheless, *Foldi* is a negligence action that addresses the question, not of child abuse or neglect, but rather of tort liability of neglectful parents, which has different policy considerations. Additionally, unlike the mother in *Foldi,* C.H. did leave her agile infant son unsupervised effectively at a "railroad track"; she placed him in a moveable play yard in her bedroom in close proximity to a nightstand which held dangerous prescription medication. Therefore, it was error for the court to have made *Foldi* the "polestar" of its analysis of this case.

■ "[T]he proper focus of an inquiry under *N.J.S.A.* 9:6–8.21 is on the harm to the child." *G.S., supra,* 157 *N.J.* at 180, 723 *A.*2d 612. Moreover, as previously stated, a "parent's conduct must be evaluated in context based on the risks posed by the situation." *T.B., supra,* 207 *N.J.* at 309, 24 *A.*3d 290 (citing *G.S., supra,* 157 *N.J.* at 181–82, 723 *A.*2d 612). The trial court simply compared the facts single-mindedly to *Foldi* and did not make particularized findings as required under the relevant case law with focus on the

risks posed, the harm to J.B., and whether that harm could have been prevented by a cautionary act on C.H.'s part. *See T.B., supra,* 207 *N.J.* at 306–07, 24 *A.*3d 290; *G.S., supra,* 157 *N.J.* at 181–82, 723 *A.*2d 612.

▮▮▮▮ Moreover, the court compounded its error by failing to apply the correct standard for dismissal under *Rule* 4:37–2(b). Whether the action is tried with or without a jury, the test is whether the evidence, together with the legitimate inferences thereon, could sustain judgment in favor of the party opposing the motion. *Verdicchio v. Ricca,* 179 *N.J.* 1, 30, 843 *A.*2d 1042 (2004). If, accepting as true all of the evidence that supports the position of the party defending against the motion and giving that party the benefit of all reasonable and legitimate inferences, reasonable minds could differ, then the motion must be denied. *Ibid.* Thus, if the Division established a prima facie case at the conclusion of its case in the fact-finding hearing, the motion should be denied. *See Pron v. Carlton Pools, Inc.,* 373 *N.J.Super.* 103, 111, 860 *A.*2d 973 (App.Div.2004). A prima facie case, for the purpose of an involuntary dismissal application, is any evidence, including any favorable inference to be drawn from that evidence that could sustain judgment in the Division's favor. *See ibid.*

▮▮▮ Here, the court assessed the credibility of the witnesses and made its own fact findings, essentially concluding that the incident was an accident so it must have been simple negligence on C.H.'s part. The court should have determined whether a hypothetical fact-finder might sustain the Division's claim. A dismissal only would have been proper when no rational fact-finder could conclude from the evidence "that an essential element of the plaintiff's case is present." *See Pron, supra,* 373 *N.J.Super.* at 111, 860 *A.*2d 973 (internal quotation marks and citation omitted). In ruling on a motion for an involuntary dismissal, the judicial function is a mechanical one; the court should not be concerned with the worth, nature, nor extent, beyond a scintilla, of the evidence, but only with its existence, viewed in favor of the party opposing the application. *Cameco, Inc. v. Gedicke,* 299 *N.J.Super.*

203, 212, 690 *A.*2d 1051 (App.Div.1997) (citing *Dolson v. Anasta-sia,* 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969)), *aff'd, as modified and remanded,* 157 *N.J.* 504, 724 *A.*2d 783 (1999). We are satisfied the record demonstrates that the Division established a prima facie case that C.H. either abused or neglected J.B. within the intendment of the statute and case law. Accordingly, sua sponte involuntary dismissal of the complaint against C.H. was not warranted.

Affording the Division the benefit of all reasonable and legitimate inferences from the testimony and evidence presented, C.H. committed the following intentional acts, with the unintentional result of J.B. swallowing twenty-one to thirty Wellbutrin pills, being hospitalized in critical condition, being placed on an ECMO machine (characterized by Dr. Gertz as the "ultimate last step in trying to save somebody's life"), and being discharged after almost two weeks in excellent condition as "a miracle":

- C.H. placed strong, agile, eleven-month-old J.B. in a flexible play yard, capable of being maneuvered and moved, within one to two feet from a nightstand, of the same height on which she left a bottle of prescription antidepressant pills.

- C.H. did not believe it was necessary to keep her medication in a locked box and routinely kept it on her nightstand.

- C.H. did not fasten the safety cap on the bottle of pills.

- Despite being J.B.'s sole supervisor at the time, C.H. admitted she was not attentive to J.B. and reported "fiddling" with her cellular phone for two to three minutes. The court found the time frame could have been five to ten minutes. Considering C.H. was the sole supervisor from approximately 7 p.m. to 8 p.m. and she never took the stand,[7] her period of inattention could have been considerably more, particularly considering the number of pills J.B. ingested.

- C.H. was aware of J.B.'s agility and, as an adult, was certainly aware of the dangers associated with prescription medication, particularly the effects of Wellbutrin on her, and of the grave danger that would result from J.B. swallowing her prescription pills.

- C.H. felt overwhelmed with her new home, a change of environment, and becoming a new mother.

- C.H. suffered from postpartum depression.

- A search warrant revealed numerous narcotic pain medications in the bedroom.

---

[7] The court incorrectly referred to C.H.'s statement to the Division as "uncontradicted testimony."

Based on these facts, and resolving all reasonable inferences in favor of the Division, a judge could conclude that J.B. was an abused or neglected child—a victim either of injury by non-accidental means, was subjected to a "substantial or ongoing risk of physical injury," or was subjected to impairment of his physical condition as a result of C.H.'s failure "to exercise a minimum degree of care" under *N.J.S.A.* 9:6–8.21(c)(1), (2), or (4). *See Dolson, supra,* 55 *N.J.* at 5–6, 258 *A.*2d 706.

Based on the procedural and substantive errors, we reverse the sua sponte dismissal of the abuse or neglect complaint against C.H., and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.