# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0211-19T4
              A-0212-19T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.M.E. and C.G.,

      Defendants-Appellants,

and

R.M.-E., M.E.P., and S.A.L.,

      Defendants.

_____

IN THE MATTER OF M.E., K.E.,
C.P. D.P., A.L., N.L., D.L. and
J.J.M.G., minors.

_____

Submitted December 1, 2020 – Decided  December 22, 2020

Before Judges Fisher and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket Nos. FN-14-0086-18 and FN-14-0087-18.

Joseph E. Krakora, Public Defender, attorney for appellant J.M.E. (Robyn A. Veasey, Deputy Public Defender, of counsel; Beth Anne Hahn, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant C.G. (Robyn A. Veasey, Deputy Public Defender, of counsel; Phuong V. Dao, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Peter D. Alvino, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Maria Emilia Borges, Assistant Deputy Public Defender, on the brief).

PER CURIAM

On May 24, 2018, five-year-old K.E. (Karen, a fictitious name[1]) was rushed to the hospital in need of emergency neurosurgery and intubation after sustaining life-threatening injuries. Her father and stepmother – defendants J.M.E. (Jason) and C.G. (Carol) – claimed the injuries were caused by a slip in the bathtub, but the trial judge determined after a seven-day hearing that Carol

---

[1] We use fictitious names for the parties and their children to preserve their privacy.

assaulted the child and Jason had turned a blind eye to Carol's abusive conduct. In appealing, defendants argue, among other things, that the trial judge erroneously shifted the burden of persuasion to them and the evidence offered by plaintiff Division of Child Protection & Permanency was insufficient to support the judge's findings and conclusions. We find no merit in these arguments and affirm.

Carol is the biological mother of six sons: C.P. (Charles, born in 2008), D.P. (Donald, born in 2009), A.L. (Albert, born in 2013), N.L. (Nicholas, born in 2014), D.L. (Devon, born in 2015), and J.E., Jr. (Jason, Jr., born in 2019, during the course of the litigation). Jason is the biological father of two of Carol's children, Devon and Jason Jr. Jason also had physical custody of his two daughters: Karen (born in 2013) and M.E. (Marianne, born in 2011).

In October 2017, Carol and her children moved to New Jersey from Pennsylvania and began living with Jason – recently estranged from his wife, Rosa – and his and Rosa's daughters. This relocation alarmed the Division's Pennsylvania counterpart, which had removed Carol's six sons in April 2016 due to her opiate addiction and her failure to ensure the children's attendance at school. The children were returned to her in June 2017. So, when she moved to New Jersey, Pennsylvania authorities filed a referral with the Division,

asserting Carol's use of cocaine and Adderall, her having punched Charles in the face, and her having left Devon, soiled and alone, in a high chair for seven hours.

The Division opened a case in October 2017 and began visiting the family on a monthly basis. Division workers found the home was "chaotic," but that the family "appeared to be stable and adjusting" to the new living arrangements. This adjustment period, however, took conspicuously long; the eldest sons, Charles and Donald, did not begin attending school until more than a month after the family's relocation, and Carol did not transfer her children's health insurance to New Jersey, preventing them from receiving services, such as Division-recommended behavioral therapy. As of March 2018, Jason had not secured health insurance for Marianne and Karen, despite the Division's attempts to facilitate the process.

Karen had several medical visits soon after Carol and her children moved into Jason's home. In late October 2017, Carol took Karen to the hospital for a facial injury that Carol claimed was caused when Karen's biological mother, Rosa, hit the child; an x-ray revealed no fractures. Days later, Carol brought Karen to a doctor claiming Rosa physically abused her. The doctor observed bruising on Karen's shins but saw no other evidence of possible abuse. Karen was not examined again until January 2018 when there were concerns both she

A-0211-19T4

and Marianne were underweight. A follow-up appointment for April 2018 was later cancelled; the record reveals that such cancellations were not uncommon.

Karen is not the only child in the family to have been medically examined for signs of potential physical abuse. In April 2018, a teacher observed a bruise on the edge of Charles's ear. The next day, a Division worker met with Charles at school to photograph and discuss the bruise. Charles said Carol caused the bruise by pulling "hard" on his ear "because he was talking back to her and giving her attitude." He said Carol had used this type of physical punishment on him before, as well as Donald, who advised the Division worker that Charles, Marianne, and Karen had all had their ears pulled by Carol. When the Division worker interviewed Carol about this, she admitted pulling Charles's ear for "not listening" and pulling Karen's ear in the past for wetting herself after "refus[ing] to go to the bathroom." Carol denied using any other forms of physical punishment on the children and expressed remorse for punishing Karen once she learned that Karen's incontinence difficulties arose from other medical issues.

Karen, in fact, had a significant medical history. She was born prematurely and was diagnosed in 2015 with global developmental delays related to autism, central hypotonia, and possible cerebral palsy. During a child study team meeting, Carol said that Karen routinely suffered bruises because

5

she is "accident prone" and has "serious problems with gross and fine motor skills." She claimed Karen "bumps and falls often, sometimes hitting her head," "scratches herself and . . . shakes excessively," and had recently "forgotten skills" such as eating with a spoon. Carol and Jason both stated during this child study team meeting that Karen had been diagnosed with alpha-thalassemia and offered this condition as the cause for her bruising.[2]

In March 2018, Karen underwent a physical therapy evaluation and was reported as being able to move independently without assistive devices. She was found to have a "good ability to execute high level skills," and scored in the average range for all administered tests.

Two months later, on May 24, 2018, a Division worker arrived at the family's home to investigate bruises and scratches on Marianne; the worker was turned away when Charles, who answered the door, said Carol was in the

---

[2] Alpha-thalassemia is an inherited blood disorder, which causes the body to make less hemoglobin than normal and can cause red blood cells to be smaller than normal size. Depending on which of the four types of alpha-thalassemia is inherited, individuals can suffer from mild to severe anemia, fatigue, exercise intolerance and – in more severe cases – an enlarged liver or spleen, yellowish skin, and leg ulcers. Those who are only carriers of alpha-thalassemia have mild to no symptoms. See Hannah Tamary & Orly Dgany, Alpha-Thalassemia, GeneReviews (Nov. 1, 2005), https://www.ncbi.nlm.nih.gov/books/NBK1435/ (last updated Oct. 2, 2020). The physicians who so diagnosed Karen stated that the alpha-thalassemia trait would not cause bruising.

A-0211-19T4

shower.[3]   When the Division worker returned thirty minutes later, Carol was present.  During the interview that then took place, Carol attributed the scratches on Marianne having turned her head away from a washcloth during a bath.  During this visit, the Division worker looked in on Karen, who was alone in a dark bedroom that smelled of feces.  Karen was dressed in sweatpants despite the day's mid-eighty-degree temperature.  The Division worker did not notice any visible bruises on Karen's face or arms.  Carol then told Karen to go to the bathroom for a bath, and the Division worker left.

Less than an hour later, Carol called the Division worker to report that Karen fell in the bathtub during a shower while Carol was in another room.  Karen was unconscious and not breathing.

Karen had suffered life-threatening injuries.  The record reveals she may never again walk or be able to communicate.  Based on photographs and other medical evidence deemed credible, the judge found "[t]here were bruises all over [Karen's] limbs, back and head, in various stages of healing."  The child was diagnosed with a fracture of the right occipital bone, a subdural hematoma, extending from the right frontal through the right parietal and temporal regions,

---

[3]  The judge found credible evidence that demonstrated Carol was not home and had left Charles in charge of all the children.  Carol later admitted this.

and a left posterior parietal scalp hematoma. Photographs depicted the intubated five-year-old blanketed by extensive bruising and lacerations on her face, back, buttocks, and legs, including her inner thighs. The judge found credible the testimony of the Division worker that many of the bruises depicted in the photographs of the child that were taken in the hospital were not present when she saw the child hours earlier.

A Division worker interviewed Carol the next morning. Carol claimed Karen had slipped in the bathtub and hit her head. She also testified Karen had been having unexpected bruising that resulted from alpha-thalassemia. The other children were individually interviewed by the Division. During this questioning, a Division worker noted several marks and bruises on Marianne's body, including scratches on her face and neck, and bruises on her forearm and knee. Marianne said she did not know how she received any of the marks and, without being asked, volunteered that "mom and dad never hit me." After his interview, Donald expressed fear that his mother would be arrested and that Carol "was scared that [he] and [his] brothers said something bad" to the Division. That day, all the children except Karen were transported for pre-

resource home placement physicals and removed from Carol and Jason's custody.[4]

This Title Nine action was commenced a few days after Karen sustained her life-threatening injuries. The judge determined on the return date of an order to show cause that there was good cause to believe Karen had been physically abused and that both Jason and Carol posed a "significant risk" to the other six children as well. The judge granted the Division's application for care, custody, and supervision of all seven children. In a hearing that started in early January and ended in early February 2019, the judge heard testimony from Division workers, child abuse experts, a school social worker, and medical experts. Carol and Jason did not testify. Carol called a medical expert to testify; Jason called no witnesses.

By way of an oral decision, the trial judge concluded, among other things, that Carol physically abused Karen, that Karen was neglected and abused by

---

[4] A month later, Charles disclosed to his resource mother that Carol had "hit him on the legs with a broom" and that he had seen Carol "pick [Karen] up by her hair and throw her to the ground," and "hit [Karen] with a shoe." Donald confirmed what Charles said. In addition, Charles reported that he had seen his siblings get hit with a belt, that he was beaten with a plastic hanger, and that his father "doesn't do anything." Charles also said that after the removal he and his brother purposefully misbehaved because Carol told him that doing so would keep them from remaining in the foster system or getting adopted.

Jason due to his failure to recognize what was occurring within the home, and that the abuse of all the other children could be inferred, as permitted by N.J.S.A. 9.6-8.46(a)(1). The action was dismissed at the end of July 2019 when the trial judge approved the Division's plan of seeking the termination of defendants' parental rights.

In appealing, both defendants argue that the trial judge erroneously shifted the burden of persuasion to them. Carol argues that the burden should have remained on the Division at all times and it was not incumbent on her to prove "she did not cause the injuries" to Karen, and Jason also complains of the shifting of the burden of persuasion. Both defendants also assert they were prejudiced by the judge's failure to announce at an earlier stage that the burden would be shifted. We find no merit in these arguments for the simple reason that the judge never shifted the burden of persuasion to either defendant.

To obtain a determination that a child was abused or neglected under Title Nine, the plaintiff may show, among other things, that the parent or guardian "inflict[ed] or allow[ed] to be inflicted . . . physical injury by other than accidental means" or "create[d] or allow[ed] to be created a substantial or ongoing risk of physical injury to such child by other than accidental means." N.J.S.A. 9:6-8.21(c). The preponderance standard is applied in such matters,

N.J.S.A. 9:6-8.46(b)(1), and a judge's findings must be supported by "competent, material, and relevant evidence," N.J.S.A. 9:6-8.46(b)(2). See also N.J. Div. of Youth & Family Servs. v. C.H., 428 N.J. Super. 40, 62 (App. Div. 2012). A prima facie case of abuse or neglect can be established with proof of injuries or a condition "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent of guardian." N.J.S.A. 9:6-8.46(a)(2).

To be sure, there are times when an abused child cannot explain what has occurred either because of the child's age or because of the consequences of the abuse. N.J.S.A. 9:6-8.46(a)(2). In those cases, it may be appropriate to require that the parent or guardian provide a credible explanation for what occurred or else be subjected to an inference that the injuries were brought about by abuse or neglect. At times, the circumstances may permit saddling a defendant only with "the burden of going forward" by presenting evidence "to rebut the evidence of parental culpability" while the burden of persuading the trier of fact that the child was abused remains with the Division. See N.J. Div. of Youth & Family Servs. v. J.L., 400 N.J. Super. 454, 471 (App. Div. 2008) (quoting In re Phillip M., 624 N.E.2d 168, 172 (N.Y. 1993)). For example, in J.L., the trial judge determined there were several factors constituting credible, potential

causes for the child's injuries, making it unclear to the court when and how she was injured. Id. at 472-73. In J.L., those circumstances included bone fractures occurring at three different times over several weeks and multiple individuals besides the parents having access to the child. Id. at 469. There, the burden was appropriately shifted to the parents "to come forward with evidence to rebut the presumption of abuse or neglect" without shifting the burden of persuasion. Id. at 470. In other instances, when the possibilities are not so multi-faceted, it may be appropriate to shift the burden of persuasion to the parent or guardian. See, e.g., In re D.T., 229 N.J. Super 509, 517 (App. Div. 2008).

If Carol had offered no explanation for what happened, there would have been nothing erroneous about applying either of these burden-shifting paradigms. See generally N.J. Div. of Child Prot. & Permanency v. C.J.R., 452 N.J. Super. 454 (App. Div. 2017). Karen suffered near-fatal brain damage and sustained extensive bruising and bodily injuries less than an hour after a Division worker saw her and noticed nothing wrong. Jason was not home at the time, and Marianne, Charles, and Donald were outside playing. Because Carol was the only adult in the home, the possibilities were limited and the judge could have required that Carol prove that she did not abuse the child. Indeed, it is hard to imagine a more appropriate instance for shifting the burden of persuasion

12

under the traditional res ipsa loquitor standard described in <u>Anderson v.</u> <u>Somberg</u>, 67 N.J. 291, 298-99 (1975).

But the judge examined the evidence and made findings without shifting either the burden of persuasion or the burden of going forward. The judge weighed the Division's considerable proofs that he found credible, and he considered Carol's out-of-court explanations, all of which the judge rejected in light of the what he referred to as the "overwhelming" evidence amassed by the Division. The judge rejected the assertion that the head injuries could have resulted from a fall in the tub and the claims that the bruises resulted in some accidental way. The judge rejected the contention that Karen was clumsy by relying on credible testimony of earlier medical exams, rejected the contention that bruising resulted from alpha-thalassemia by relying on credible medical testimony to the contrary, and rejected the claim of accidental bruising by referring to the bruises on the child's inner thighs, which would not normally occur through a child's routine fall while playing.

In short, we reject defendants' arguments that the judge shifted the burden of persuasion to them because the judge simply didn't do that.[5] He found

---

[5] For this same reason, we reject the arguments that the judge deprived defendants of due process by failing to give notice that he would shift the burden of persuasion to them.

A-0211-19T4

sufficient support for the Division's claim that Carol physically abused Karen without resorting to any burden shifting. And, as for Jason, the judge found from the Division's evidence that Karen's past injuries "could not have reasonably gone unnoticed" by Jason and that he was "complicit by allowing horrific abuse upon [Karen] and by engaging in the subterfuge attempting to hide those injuries."

Defendants also argue there was insufficient evidence to support the judge's findings or the conclusions he drew from those findings. We find no merit in those arguments. Judge-made findings are "considered binding on appeal when supported by adequate, substantial and credible evidence," Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974), a deferential standard particularly appropriate in family court matters, Cesare v. Cesare, 154 N.J. 394, 413 (1998) (holding that "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding"); see also N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010). The record was replete with evidence that the judge found credible and that, in the judge's view, "overwhelming[ly]" demonstrated that Karen was a physically active five-year old – as observed by a Division worker – left near death an hour later. The judge

was entitled to find from this evidence that the child did not slip and fall in the bathtub but was instead beaten by Carol. These findings fully supported a determination that Carol "created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement." N.J.S.A. 9:6-8.21(c)(2). Moreover, there was other medical evidence that revealed to the judge's satisfaction that the child had suffered injuries in the past that should have been noticed and acted on by Jason who, instead, turned a blind eye, thereby failing to "exercise a minimum degree of care." N.J.S.A. 9:6-8.21(c)(4). And there was evidence from which the judge could conclude that both defendants attempted to hide the true cause of Karen's injuries through smoke screens about the child's anemic condition.

The judge was also entitled to conclude from these findings that not only was Karen endangered by being in defendants' care but all their other children as well. We have previously said, "[p]redictions as to probable future conduct can only be based upon past performance," J. v. M., 157 N.J. Super. 478, 493 (App. Div. 1978), and the physical abuse of one child can be "a dangerous harbinger to one or more of the others," N.J. Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 68 (App. Div. 2002). The judge was entitled to

15

infer from what happened to Karen that the health and well-being of the other children were and would continue to be jeopardized if left in the care of either or both defendants.  See N.J.S.A. 9:6-8.46(a)(1) (declaring that "proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of, or the responsibility of, the parent or guardian").

In the final analysis, our role is limited.  Appellate courts will not intervene where a decision has been soundly based on the findings of a judge who had the opportunity to see the witnesses testify and obtain a feel of the case that an appellate court can never realize.  M.C. III, 201 N.J. at 342-43 (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).  The judge made thorough factual findings that are fully supported by the evidence found credible.  We will not second-guess such well-reasoned findings.

Any arguments not specifically addressed were found to be without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0211-19T4